Filed 12/13/13  P. v. Nunez CA

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JESUS BENAVIDEZ NUÑEZ ,<br><br>  Defendant and Appellant. | F065033<br><br>(Super. Ct. No. F11901862)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Kathleen A. McKenna, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Jesus Benavidez Nuñez appeals following his convictions for involuntary manslaughter with personal use of a firearm, child endangerment, and

possession of a firearm by a felon. He contends the trial court prejudicially erred by failing to instruct the jury with CALCRIM No. 3404 regarding the defense of accident. We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 30, 2011, defendant and his fiancée Analia Sandoval arrived at defendant's sister's house where they were staying. It was about 5:15 in the evening and several family members were out front. After the two got out of their SUV, defendant confronted one of the three dogs residing at the home.[1]

According to Sandoval, defendant was trying to get through a walkway to their room in the back. The dog was barking and growling in the carport area in front of the home. Family members testified defendant was teasing the dog by stomping his feet. Defendant had teased the dogs previously by stomping his feet or pulling out his gun. On another occasion, he had fired a gun into the ground near the dogs. On this occasion, defendant responded by pulling a gun from the waistband of his pants.

At the time of the incident, at least eight other persons were present in or near the carport area, including defendant's sister, victim Leticia Casas, his nieces Michelle Alvarez and Danielle Casas, his nephew Nathaniel Vallejo, his fiancée, his son Jesse Nuñez, and J.L. and D.L.

When defendant pulled the gun from his waistband, it was either pointed toward the dog or raised in front of him at chest level; he was facing his sister's direction. Within a second or two after pulling out the gun, a single shot was heard. Leticia Casas was struck by a bullet in the face; she fell to the ground bleeding from her wound. Defendant dropped the gun and ran toward his sister. He appeared shocked or stunned and scared.

---

[1]Defendant's fiancée, his niece Danielle Casas, his nephew Nathaniel Vallejo, and J.L. all testified one dog was involved in the incident and the other two dogs were confined to or tied up in the backyard. His niece Michelle Alvarez recalled two of the three dogs being involved.

Nine-year-old J.L. had been asked by her mother to retrieve the loose dog. She was trying to grab the dog before it could reach defendant; she got a hold of the dog's collar. At that point, defendant was directly in front of her and Leticia Casas was behind her. J.L. looked up at defendant and saw a gun. She was scared. She heard a loud bang and felt "a little air flash[] by [her] hair."

Leticia Casas died as the result of an injury to the left carotid artery caused by the gunshot wound to her head.

A loaded .38-caliber semiautomatic weapon was located in the carport area by police officer Robert McGuire shortly after his arrival on scene. Officer Daniel Corona took defendant into custody; as he did so, defendant yelled, "I didn't shoot. I didn't shoot. It fell out of my pocket."

Homicide detective Mark Chapman of the Fresno County Sheriff's Office interviewed defendant later that evening. Defendant admitted pulling the trigger. Initially, defendant claimed he pulled out the gun "possibly to scare the dogs," then later said he did so to protect himself from the dogs. He admitted pulling the gun on the dogs once or twice before and claimed it frightened them off. He did not indicate he had previously fired the weapon at or near the dogs. Defendant complained the dogs had been a problem for some time.

Despite accurately describing the two safeties on his gun, defendant was unable to say whether or not the safety mechanisms were in place at the time of the incident. Defendant advised he had loaded the gun the night before, but claimed he did not know there was a round in the chamber. He could not recall or describe which hand he used to pull the gun from his waistband, he just remembered the gun going off. Defendant admitted using methamphetamine earlier that day. When he was advised his sister had died from her injuries, defendant sobbed.

On April 20, 2012, in a second amended information filed by the Fresno County District Attorney, defendant was alleged to have committed the following crimes: count

3.

1—involuntary manslaughter by an unlawful act (Pen.[2] Code, § 192, subd. (b)); count 2—child abuse or endangerment (§ 273a, subd. (a)); and count 3—possession of a firearm by a felon (former § 12021, subd. (a)(1)). Further, it was alleged as to count 1 that defendant personally used a firearm within the meaning of section 12022.5, subdivision (a). Additionally, as to count 3, it was alleged that defendant had suffered prior convictions and served a prior prison term pursuant to section 667.5, subdivision (b). Defendant pled not guilty and denied all allegations. Subsequently, the parties entered into a stipulation wherein defendant admitted to the prior convictions and to having served a prior prison term.

Following jury trial, defendant was convicted of all counts. The jury also found true the personal use of a firearm allegation.

On May 25, 2012, defendant was sentenced to state prison for a total of 15 years. He filed a notice of appeal that same date.

## DISCUSSION

Defendant argues the trial court erred when it refused to give pinpoint instruction CALCRIM No. 3404 because there was substantial evidence the shooting was an accident. Moreover, he contends the error was not harmless because the jury was precluded from considering the entire defense theory and the record demonstrates the jury struggled with whether he was acting intentionally when the gun discharged. The People contend the trial court properly refused to give the instruction because its language duplicated language given in other instructions, the evidence established defendant acted intentionally when he drew his weapon, and he was criminally negligent. Additionally, the People assert error, if any, was harmless.

---

[2]All further statutory references are to the Penal Code unless otherwise indicated.

4.

*The Applicable Law*

Section 26 provides that "[a]ll persons are capable of committing crimes except those belonging to the following classes:  [¶] … [¶] … Persons who committed the act … by accident, when it appears that there was no evil design, intention, or culpable negligence."  Because the so-called defense of accident is actually a claim the prosecution has failed to prove the intent element of the crime, the trial court has no sua sponte duty to instruct on the defense of accident.  (*People v. Anderson* (2011) 51 Cal.4th 989, 997.)  "A trial court's responsibility to instruct on accident … generally extends no further than the obligation to provide, upon request, a pinpoint instruction relating the evidence to the mental element required for the charged crime."  (*Ibid.*, italics omitted.)

"A trial court must give a pinpoint instruction, even when requested, only if it is supported by substantial evidence.  [Citation.]"  (*People v. Ward* (2005) 36 Cal.4th 186, 214-215.)  And, "'[i]n determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt …."'"  (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)  But where standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused.  (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.)

*The Jury Instruction Conference*

The court and counsel for the parties discussed the jury instructions after the People had rested their case-in-chief, and the defense elected not to present a defense case.  During that conference, the following discussion occurred:

"THE COURT:  Okay.  That gets us to 581.  Now, wasn't there another accident instruction that was requested?

"[PROSECUTOR]:  I believe that was just 510.

"THE COURT:  Just 510?

5.

"[PROSECUTOR]: That was the only one that I requested.

"THE COURT: No. We had one under 34—yeah, instruction 3404. And this one does apply to criminal negligent crimes. However, all of that says is that you can't find the defendant guilty unless you are convinced that he acted with criminal negligence. That would appear to be consistent with the instructions that we have here. Let's take a look at the use notes for that. [¶] I think 3404 does apply because it is referenced to 195, which I believe—195 of the Penal Code that is—

"[DEFENSE COUNSEL]: Which defines accidental and excusable homicide?

"THE COURT: Uh-huh. There is nothing inconsistent with that second paragraph in instruction 3404 with the other instructions I'm giving here. All it does is reinforce that they have to be convinced beyond a reasonable doubt that he acted with criminal negligence, and that's true.

"Okay. So let's go back. We're giving instruction 251 to lead the way. That's followed by 253, which says, 'To find a person guilty of the crime of involuntary manslaughter a person must do an act with criminal negligence.' Criminal negligence is defined in the other instructions—in instructions on that crime.

"[PROSECUTOR]: 3404, paragraph 2, is exactly the same language.

"THE COURT: It's exactly the same. Because what I'm instructing immediately after 253 is that, 'In order to find the defendant guilty of Count One, the People must prove beyond a reasonable doubt that, 1, the defendant committed a crime, 2, the defendant committed the crime with criminal negligence,' same thing.

"[PROSECUTOR]: I don't see the need to give both 3404 and 253.

"THE COURT: Not if I'm giving 253 right in front of the involuntary manslaughter instruction. It's exactly the same language that I am giving in 581. And, in fact, I'm telling—I'm using reasonable doubt in fewer words before telling them that they have to find criminal negligence. [¶] All right. So let's go through 2— or 581.…"

The court later stated to defense counsel its belief

"that within this instruction [CALCRIM No. 581] you have all the leeway to argue that he did not act with criminal negligence based on the circumstances known to him, believed by him, and is supported by the

6.

evidence.  I mean, I—I believe that you have—that's where your defense really is because we have—it's not an otherwise lawful act based on the way it's pled.

"[DEFENSE COUNSEL]:  I understand."

### The Instructions Given

Pertinent to the issue on appeal, the jury was instructed with CALCRIM Nos. 251, 253, and 581.  CALCRIM No. 251 provides:

"The crimes and other allegations charged in this case require proof of the union, or joint operation, of act and wrongful intent.

"For you to find a person guilty of the crimes in this case or to find the specific allegations true, that person must not only intentionally commit the prohibited act, but must do so with an intent or mental state.  The act and the intent or mental state required are explained in the instruction for each crime or allegation."

CALCRIM No. 253 states:

"For you to find a person guilty of the crimes of Involuntary Manslaughter and Child Endangerment, a person must do an act with criminal negligence. Criminal negligence is defined in the instructions on that crime."

Finally, CALCRIM No. 581, pertaining to the crime of involuntary manslaughter provides the following:

"The defendant is charged in Count One with involuntary manslaughter [in violation of … section 192(b)].

"To prove that the defendant is guilty of this crime, the People must prove beyond a reasonable doubt that:

"1.  The defendant committed a crime;

"2.  The defendant committed the crime with criminal negligence; AND

"3.  The defendant's acts caused the death of another person.

"[The People allege that the defendant committed the following crime[s]:  Possession of Firearm by a Felon in violation of … section 12021(a)(1).

7.

"Instruction 2511 tell[s] you what the People must prove in order to prove that the defendant committed a violation of … section 12021(a)(1), Possession of a Firearm by a Felon.

"Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when:

"1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; AND

"2. A reasonable person would have known that acting in that way would create such a risk.

"In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act.

"[An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.]

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

Defendant requested that CALCRIM No. 3404 be given. That instruction provides as follows:

"[The defendant is not guilty of _____<insert crime[s]> if (he/she) acted [or failed to act] accidentally without criminal negligence. You may not find the defendant guilty of _____ <insert crime[s]> unless you are convinced beyond a reasonable doubt that (he/she) acted with criminal negligence. *Criminal negligence* is defined in another instruction.]"

*Our Analysis*

We conclude the trial court did not err. The valid points in the proposed pinpoint instruction, specifically CALCRIM No. 3404, were adequately covered by other instructions given to the jury, namely, CALCRIM Nos. 251, 253, and 581. (See *People*

*v. Gutierrez, supra*, 28 Cal.4th at p. 1144.)  More importantly, even if we were to conclude a pinpoint instruction explaining defendant is not guilty if he "acted accidentally without criminal negligence" should have been given, on this record nothing in the standard instructions given precluded the jury from finding defendant acted accidentally.  Therefore, error, if any, was harmless.

As the trial court correctly noted during the jury instruction conference, the language in CALCRIM No. 3404 is duplicative of language in other instructions given.  A review of the record confirms this statement.  Therefore, the absence of CALCRIM No. 3404 and its defense-phrased content did not prejudice defendant.  The jury was fully and properly instructed with CALCRIM Nos. 251, 253, and 581, and regarding the mental state concerning a violation of section 192, subdivision (b).  (See *People v. Ervin* (2000) 22 Cal.4th 48, 89-91 [error in failing to instruct regarding particular instruction harmless in light of other instructions given].)

> "In determining whether instructional error was harmless, relevant inquiries are whether 'the factual question posed by the omitted instruction necessarily was resolved adversely to the defendant under other, properly given instructions' [citation] and whether the 'defendant effectively conceded the issue' [citation].  A reviewing court considers 'the specific language challenged, the instructions as a whole[,] the jury's findings' [citation], and counsel's closing arguments to determine whether the instructional error 'would have misled a reasonable jury …' [citation]." (*People v. Eid* (2010) 187 Cal.App.4th 859, 883.)

Because the language of CALCRIM No. 3404 was largely duplicative of language provided in the other instructions given, and because the instructions as a whole explained to the jury that it could not find defendant guilty of involuntary manslaughter or child endangerment unless it determined he acted with criminal negligence, the failure to instruct on the defense of accident could not have misled the jury.

Because the alleged error here does not involve a failure to instruct on an element of the crime, the federal standard of *Chapman v. California* (1967) 386 U.S. 18, 24 does not apply.  (See *People v. Cornwell* (2005) 37 Cal.4th 50, 89, disapproved on other

grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Instead, the "failure to give a pinpoint instruction is reviewed for prejudice under the *Watson*[3] harmless error standard." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.) Therefore, our inquiry considers "whether there is a 'reasonable probability' that a result more favorable to the defendant would have occurred absent the error. [Citation.]" (*People v. Aranda* (2012) 55 Cal.4th 342, 354.)

Defendant relies upon *People v. Gonzales* (1999) 74 Cal.App.4th 382 and *People v. Jones* (1991) 234 Cal.App.3d 1303, both disapproved on other grounds in *People v. Anderson*, *supra*, 51 Cal.4th at page 998, footnote 3, to support his position.

In *Gonzales*, there was evidence the alleged victim was accidentally struck by the defendant when he opened the door to a bathroom. The court held the failure to give an accident instruction was prejudicial because during deliberations, the jurors sent out a question requesting clarification of the meaning of "willful intent." (*People v. Gonzales*, *supra*, 74 Cal.App.4th at pp. 388, 391.) The trial court reread several of the pertinent instructions, but the jurors indicated they were still "troubled" with the concept of "willfully versus accidentally." (*Ibid*.) Thereafter, the jurors indicated they were deadlocked, and one juror indicated the problem involved the meaning of "willful intent" as to the crime of corporal injury. (*Id*. at p. 389.) Eventually the jurors reached a verdict without any further instruction on that point. (*Id*. at pp. 384, 389.)

*Gonzales*, however, is distinguishable from this case. While the jury here had questions during deliberations, those questions did not relate to the intent connected to the involuntary manslaughter charge.

It appears the jury's first request asked whether Nathaniel Vallejo was to be considered a victim for purposes of count 2. The court responded that only J.L. was to be considered a victim for purposes of that count. The jury's next request sought a

---

[3]*People v. Watson* (1956) 46 Cal.2d 818, 836.

10.

definition of "displays gun in menacing manner. (Is it intent or actual action)." The request pertains to the special allegation of personal use of a firearm because the language used by the jury comes directly from CALCRIM No. 3146. It provides, in relevant part: "If you find the defendant guilty of the crime charged in Count One, Involuntary Manslaughter, you must then decide whether … [¶] … [¶] Someone personally uses a firearm if he or she intentionally does any of the following: [¶] 1. *Displays the weapon in a menacing manner.*" (Italics added.) The court properly referred the jury to CALCRIM No. 3146, regarding the personal use of a firearm, and CALCRIM No. 200. Significantly, defense counsel did not ask the court to respond to the jury's question by instructing it on accident, despite a thorough discussion about how the court should respond to the jury's request.

Next, the jury asked to examine the gun. That request was accommodated. The last request of April 26, 2012, stated the following: "Your honor, we are unable to come to a conclusion on count #2. We are also unable to conclude … the use of a firearm. (proved or not proved)" To the degree the latter request relates to the firearm, it is plain the request specifically refers to the gun's use and whether the jury could find that use true or not, a determination made only after the jury finds defendant guilty of involuntary manslaughter, an act involving criminal negligence. The jury did not indicate at any time that it was having any difficulty making a determination regarding the intent related to the involuntary manslaughter charge. With regard to the representation that the jury was unable to reach a verdict as to count 2,[4] there is no indication as to the reason for this difficulty.

_____

[4]With regard to this count, the jury was instructed with CALCRIM No. 821, which provides, in pertinent part: "To prove that the defendant is guilty of this crime, the People must prove beyond a reasonable doubt that: [¶] [1. The defendant willfully caused or permitted a child to suffer unjustifiable physical pain or mental suffering;] [¶] [2. The defendant caused or permitted the child to suffer or be endangered under circumstances or conditions likely to produce (great bodily harm/ [or] death); [¶ ] AND [¶] [3. The defendant was criminally negligent when he caused or permitted the child to suffer or be endangered.]"

The following morning, shortly after resuming deliberations, the jury asked for the following:

> "Can we have Mark Chapman[']s testimony and ~~Nathaniel Vallejo's.~~

> "● Legal definition of menacing.

> "● Legal definition of mental suffering.

>   "(If pulling out a weapon is considered menacing)

> "● Legal definition of intentional."

Thus, it appears the jury's difficulty with count 2 pertained to the element of "mental suffering" as referenced in the request. There is no indication the jury's request related to defendant's mental state for that crime.

The record reveals the court and counsel agreed the reporter should be sent in to read back Detective Chapman's testimony as per the request. While discussing the balance of the jury's requests of that morning, the trial court stated: "So let's take our time to do that [agree on the definitional language requested] and let's get Madam Reporter started on Detective Chapman's readback because I think that would help the jury at this time and not just leave them floundering while we work on this, okay?" With the attorneys' assent, the jury's request for readback was accommodated between 10:10 a.m. and 10:50 a.m. It then appears from the record that before the remainder of the jury's morning request could be accommodated or responded to,[5] the jury reached its verdicts between 11:10 and 11:15 a.m.

Therefore, it appears, based on the record before us, that the jury was concerned with elements unrelated to defendant's mental state for either involuntary manslaughter

---

[5]A written response to the jury's request appears at page 279 of the clerk's transcript; however, there is no indication in either the minutes or the reporter's transcript that the response was provided to the jury prior to the verdicts.

12.

or child endangerment. The jury's inquiries regarding menacing and intent referred instead to the personal use of a firearm allegation.

In *Jones*, while the jury was not instructed on the defense of accident and misfortune, the court found the error was not prejudicial. It noted that when considering any prejudicial effect of instructional error or omission, where "*other* proper instructions adequately guide the jury in reaching factual determinations on those issues," the error is harmless. (*People v. Jones*, *supra*, 234 Cal.App.3d at p. 1314.) Like *Jones*, in light of the fact that the jury here was instructed pursuant to CALCRIM Nos. 251, 253, and 581, any error in failing to instruct the jury with pinpoint instruction CALCRIM No. 3404 was harmless. Like the court stated in *People v. Jones*,

> "[I]t is clear, beyond credible argument, that the jury necessarily rejected the evidence adduced at trial that would have supported a finding to the effect that defendant's 'accident …' defense (meant to establish that the discharge of the shotgun had not been attended by any criminal intent or purpose) was valid, thus implicitly resolving the question of that defense adversely to defendant." (*People v. Jones*, *supra*, 234 Cal.App.3d at pp. 1315-1316.)

Like *Jones*, it is clear the jury necessarily rejected defendant's defense of accident to establish he did not mean to discharge the handgun in the absence of criminal negligence. The evidence of criminal negligence here was substantial. Defendant responded to a barking and growling dog by pulling out a loaded firearm—its safety mechanisms deactivated—in a confined carport area populated by at least eight members of his family or friends. Further, in his interview with Detective Chapman, defendant admitted pulling the trigger on the gun and did so to scare the dog.

In conclusion, even assuming error, it was not reasonably probable the jury would have reached a different verdict had the court given CALCRIM No. 3404. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Moreover, even if the California Supreme Court were to determine the *Chapman* standard applies where a trial court fails to give a

pinpoint instruction requested by a defendant, we find any error, on this record, was harmless beyond a reasonable doubt.

**DISPOSITION**

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
OAKLEY, J.*

---

*Judge of the Madera Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.